(22 Misc. Rep. 66.)

HARDT et al. v. DEUTSCH et al.

(Supreme Court, Special Term, New York County. November 27, 1897.)

1. CHATTEL MORTGAGES—VALIDITY—POSSESSION—POWER OF SALE.
   A mortgage of merchandise, with an attendant agreement that the mortgagors are to remain in possession, conduct the business as before, and pay the running expenses, with no obligation to account to the mortgagees for the proceeds of sales of merchandise further than to pay as much as possible on the mortgage, is fraudulent and void as against creditors.

2. EVIDENCE—WEIGHT—SPONTANEITY.
   Testimony given frankly and spontaneously on the witness stand by a party to a suit is entitled to greater weight than a recantation drawn out by counsel after the witness had been admonished as to the effect of his admissions.

3. CHATTEL MORTGAGES—VALIDITY—POSSESSION BY MORTGAGEE—EFFECT.
   Mortgagees under a chattel mortgage void as against creditors because the right to possession and disposal of the property was retained by the mortgagors, within five hours after the mortgage had been given, and before any of the property had been disposed of, or any liens had been acquired by creditors, took entire possession of the mortgaged property. Held, that the mortgage thereupon became valid.

4. SAME—EQUITIES OF CASE.
   As between general creditors and mortgagees under an invalid mortgage, whose money has gone to pay debts of creditors, the equity of the case is with the mortgagees.

5. FRAUDULENT CONVEYANCES—INADEQUACY OF CONSIDERATION.
   Mere inadequacy of consideration for a transfer is not proof of fraud against creditors.

6. SAME—SECRET TRUSTS—EVIDENCE.
   Where mortgagees in possession under a chattel mortgage transferred the surplus arising after the payment of the mortgage debt to various creditors, to whom the mortgagors had made bona fide assignments of the surplus, and where the mortgagors were financially ruined by virtue of the mortgage, there can be no presumption of a secret trust between the mortgagors and the mortgagees.

7. SAME—FRAUD—EVIDENCE.
   An allegation that a conveyance is fraudulent as to creditors must be proven by tangible and substantial facts.

Action by Engelbert Hardt and others against Simon L. Deutsch and others.   Judgment for defendants.

Blumenstiel & Hirsch, for plaintiffs.

Horwitz & Hirshfield, Joseph Fettretch, and Henry Gottgetreu, for defendant mortgagees.

PRYOR, J.   The action is a creditors' suit to subject mortgaged chattels to the satisfaction of plaintiffs' judgments.   The mortgages in controversy, payable on demand, and covering all the merchandise in the mortgagors' store, were executed on the 16th of May, 1896, by the firm of Deutsch & Co.,—one to Wallach & Schiele as security for $42,514.06, of which $17,514.06 was an antecedent debt, and $25,000 was advanced at the time; the other to Nathan Silverstein, for $17,400, of which $12,400 was an antecedent debt, and $5,000 an advance at the time.   The consideration of the mortgages goes without challenge, and no question is made of their apparent validity.   That within five hours, at furthest, after execution, the mortgages were duly filed, and the mortgagees assumed actual, open, and exclusive possession of the mortgaged property, which they retained until by the sale of goods their debts were discharged, when they turned over the surplus to other creditors of the mortgagors, are also uncontroverted facts upon the record.   Nevertheless, plaintiffs impeach the validity of the instruments, principally upon the ground of the illegality of an agreement between the parties at the time of execution.   A mortgage of merchandise, with an attendant agreement, whether in the instrument or not, whether written or oral, and whether express or tacit, that the mortgagor may remain in possession, with a power to sell in the usual course of trade, but without an obligation to apply the proceeds in payment of the mortgage, is, as matter of law, fraudulent and void against creditors of the mortgagor.   Mandeville v. Avery, 124 N. Y. 376, 26 N. E. 951; Hangen v. Hachmeister, 114 N. Y. 560, 21 N. E. 1046; Potts v. Hart, 99 N. Y. 168; Southard v. Benner, 72 N. Y. 424; Randall v. Carman, 89 Hun, 84, 35 N. Y. Supp. 53; Cook v. Bennett, 60 Hun, 8, 14 N. Y. Supp. 683; Sperry v. Baldwin, 46 Hun, 120, 124; Yates v. Olmsted, 65 Barb. 43, 47.   Such an agreement, operating such an effect, plaintiffs impute to the parties to the mortgages in question, and upon the evidence it is impossible to resist the force of the contention.   The sole survivor of the mortgagor firm, called by the plaintiffs, testified as follows:

"Q. What did you want this money for [meaning the cash loaned]?   A. That is as I have stated.   Q. To pay debts?   A. No, to carry on the business. Q. In what way to carry on the business?   A. Not any different than before. Q. Did Mr. Wallach and Mr. Silverstein hear that you were to carry on the business?   Were they present?   A. Yes, I presume so."   Again:   "Q. What was said as to what particular debts this money was to be used for?   A. I did not know that it was used [manifestly to be used] for debts.   I supposed it was to continue our business."

Mr. Wallach, the mortgagee, testified:

"Mr. Simon L. Deutsch came to me, and told me he needed $25,000 to $30,000 to carry the business over until the following fall. * * * Q. Was it intended, when you took the mortgages, that they should go on in business? A. It was.   Q. And with the same property?   A. Yes, with the same property

that was there." Again: "By the Court: I understood you that before you took possession of the property—the time that the mortgage was executed to you—the understanding between you and Mr. Silverstein on the one side and Deutsch & Co. on the other was that Deutsch & Co. were to carry on the business as they had been carrying it on before? A. Yes, sir. Q. Was anything said or understood about their accounting for the proceeds at that time? A. They promised to pay us in the fall, when the receipts would be much larger than in the summer. Q. In the meanwhile, what was the understanding about the payment for the rent of the building and the services,—who was to pay for that? A. At that time I had no idea of foreclosing, and they were going on in the regular way. Q. They had to pay the rent? A. Yes. Q. And pay the employés? A. Certainly. Q. And out of the net profits they were to satisfy these mortgages? A. They were to pay us. They always did keep on paying us on account. Q. They had paid you along as they had money, and you kept a general account, giving them credit? A. Yes, sir. Q. Before any payment was to be made to you, they were to discharge that account, expenses, rent, etc.? A. I suppose that was understood. There was nothing said about that."

That the arrangement thus avowed by the parties suffices to invalidate the mortgages is a proposition altogether beyond controversy. Randall v. Carman, 89 Hun, 84, 87, 35 N. Y. Supp. 53, and citations, supra.

It is suggested that the witnesses did not apprehend the import of the questions, and responded blindly; but I was impressed as well by their intelligence as their candor, and I entertain no doubt that their answers corresponded with their intention. It is insisted, however, that the witnesses subsequently, on examination by their counsel, so retracted and qualified their testimony in chief that, upon the whole, the evidence fails to establish the imputed agreement. I do not so understand. As I prefer to view their explanation, they meant only to repudiate any express agreement, and not to deny any or all tacit understanding. If otherwise, however, I cannot hesitate to accept a story spontaneously and frankly delivered, before the witnesses were advised as to the effect of their admissions, in preference to a recantation, drawn out by the skill of counsel, after they had been admonished of the mischief wrought by their testimony. Indeed, in recalling or qualifying his former statement, Mr. Wallach let slip an expression quite inconsistent with his innocent explanation. Asked by his counsel: "What prompted you to take that step," i. e. demand possession of the mortgaged property? he answered, "It occurred to me, if I let Deutsch & Co. go on and sell, that they might divert the money to other purposes than the one which it was intended for, to pay us." Here, by implication, is an admission that he had consented that Deutsch & Co. might sell. It is true that these witnesses were called by the plaintiffs, but they are defendants charged with the fraud, and the court is at liberty to attach more weight to their accusing confessions than to their exculpatory retraction. Becker v. Koch, 104 N. Y. 394, 10 N. E. 701; Newman v. Clapp (Sup.) 44 N. Y. Supp. 439.

Did the case rest here, there would be no escape from the conclusion that the mortgages were avoided by the agreement for the possession and beneficial use of the property by the mortgagors. Though a mortgage be void, yet if, before any lien in favor of creditors, the mortgagor, by an independent act, transfers the property

to the mortgagee in payment of the debt, he acquires an indefeasible title.  Bowdish v. Page, 153 N. Y. 104, 109, 47 N. E. 44, and cases cited; Karst v. Gane, 136 N. Y. 316, 324, 32 N. E. 1073; Stephens v. Perrine, 143 N. Y. 481, 39 N. E. 11.  In Tremaine v. Mortimer, 128 N. Y. 1, 9, 27 N. E. 1060, the court said that, in case a mortgage be void, the mortgagee, before intervention of an adverse interest, may take a new mortgage.  "The law affords a person an opportunity to withdraw from an illegal contract before it has been executed," i. e. carried out.  And. Law Dict. "Locus Pœnitentiæ," p. 637.  By uncontradicted evidence these facts are established: That within a few minutes of receiving the mortgages it occurred to defendant Wallach that they were a precarious security, so long as the property was left in the possession and disposal of the mortgagors; that, after advising with his partners, he immediately consulted his lawyer, by whom he was instructed that the possession of the property was indispensable to the security; that thereupon he sent for the other mortgagee and the mortgagor Simon L. Deutsch; that upon their arrival the mortgagees made demand for payment of their debts; that, the mortgagor declaring his inability to pay, he was at once notified that the mortgagees would take possession of the property; that no objection was alleged by the mortgagor, who went with Wallach to the store, introduced him to the bookkeeper, and told the bookkeeper that Wallach had charge of the place.  Immediately the mortgagors "stepped out."  Thus, within five hours from the execution of the mortgages, before knowledge of their existence could have transpired, while yet none of the property had been disposed of by the mortgagors, and no lien acquired nor action brought by any creditor, the obnoxious agreement was annulled, and possession of the property surrendered by the mortgagors.  Upon the proof, the position is untenable that the mortgagees got possession of the property otherwise than under and by virtue of the mortgages.  But why were not the mortgages valid?  They were never infected with any inherent vice, their only infirmity being that they were connected with a collateral agreement which imparted to them its own illegality. . This agreement canceled, and possession taken, why are not the mortgages exempt from the vicious contagion?  The evil effects which provoke the condemnation of a mortgage allowing the possession and use of the property to the mortgagor are that it affords no real security to the mortgagee, is of benefit only to the mortgagor, and lulls the vigilance of existing, and invites the confidence of future, creditors, by a false appearance of undiminished assets.  Stimson v. Wrigley, 86 N. Y. 336; Pierce, Mortg. Merch. § 122.  None of these mischiefs ensued, or could have ensued, in the present case.  By the prompt possession of the mortgagees the security was made effectual, and all benefit to the mortgagors intercepted, and no ownership by them appeared to impose upon the public.  All the safeguards which the law provides for the protection of creditors against fraudulent transfers were, in fact, present and operative, in assurance of the good faith and legality of these mortgages,—adequate consideration, innocent intent, immediate possession, and timely filing.

Indisputably, upon the abandonment of the unlawful agreement,

new mortgages would have been valid (Tremaine v. Mortimer, supra); but the substitution of mortgages identical in terms would have been an idle and useless formality, for, in the brief interval between the agreement and its withdrawal, no adverse interest was interposed, no lien acquired, and no confidence reposed. While thus, on the one hand, no injury has befallen the plaintiffs from the transitory existence of the canceled agreement, on the other, great and irreparable loss would result to the defendants from the sacrifice of their securities. Sixty thousand dollars of their money has gone to augment the assets of the mortgagors available to creditors, and only by enforcing the securities may this sum be reclaimed. The equity of the case is altogether with the defendants. Even usury is purged by the substitution of a contract free from the original taint (27 Am. & Eng. Enc. Law, p. 964), and I cannot but conclude that, in this case, the abrogation of the vicious agreement before actual or possible harm, and while, in fact, the transaction was still conducting, leaves the mortgages unblemished and invulnerable.

Plaintiffs challenge the mortgages again, as being, in legal effect, bills of sale, and so a transfer by an insolvent debtor for an inadequate consideration. Obviously, this position is in negation of the previous contention, for a conditional and an absolute transfer are not predicable of one and the same transaction. Waiving the contradiction, the substantial answer to the proposition is that, as well in fact as in form, the instruments were chattel mortgages. As such they were delivered and accepted; as such they were foreclosed, and the surplus turned over. A chattel mortgage, payable on demand, is a familiar security, and I know of no principle or precedent by which it is transmuted into an absolute sale. Moreover, inadequacy of consideration is not proof of fraud; certainly not when the disparity between price and value is no greater than in the present case. Jaeger v. Kelley, 52 N. Y. 274.

Plaintiffs insist, further, that the transfer by the mortgagors of the surplus of the mortgaged property and proceeds authorizes a presumption of a secret trust to the use of the mortgagors, contrary to an express provision of statute. But such an inference would be a palpable non sequitur. "The mortgagor has the right to redeem before sale, or to receive the surplus, if any, that shall arise upon a sale. He has an interest in the property that is assignable, and such interest, under a general assignment for the benefit of creditors, passes to the assignee." Kitchen v. Lowery, 127 N. Y. 53, 59, 27 N. E. 357, 358; Tremaine v. Mortimer, 128 N. Y. 1, 11, 27 N. E. 1060, 1063. Accordingly, these mortgagors executed assignments of the surplus to various creditors, and such surplus was paid by the mortgagees in conformity with law and the right of the claimants. That the mortgagees were privy to these assignments, or that the assignees were not bona fide creditors, is sustained by no particle of proof. Indeed, the assignments were some time subsequent to the execution of the mortgages, and to the possession of the property by the mortgagees. "When it was delivered, the title to the property passed under it, and if at that time it represented an honest purpose, and was made in good faith, fraud could not be fastened upon it after-

wards by any acts or statements of the assignors." Roberts v. Buckley, 145 N. Y. 215, 224, 39 N. E. 966, 968. Delaney v. Valentine (Sup.) 30 N. Y. Supp. 512, 517, is distinguishable from this case in the essential circumstance that here no trust "was created by the mortgagor in the mortgage, for the benefit of other creditors not named as mortgagors." Since the effect of these mortgages was the utter ruin of the mortgagors, I am unable to discover any benefit they themselves derived from the transaction.

Finally, plaintiffs urge that the mortgages were but a device to coerce creditors to a compromise; but where is the evidence of the fact? "Fraud cannot be presumed; it must be proven; and, if there is left room for the inference of an honest intent, the proof of fraud is wanting." Bernheimer v. Rindskopf, 116 N. Y. 428, 436, 22 N. E. 1074, 1075. "When the instrument and the acts of the parties are fairly capable of a construction consistent with innocence and the general rules of law, they should be given that construction in preference to one which would impute a fraudulent intent, and defeat the general intent and purpose of the conveyance. Roberts v. Buckley, 145 N. Y. 215, 224, 39 N. E. 966. In support of their theory the ingenious counsel for the plaintiffs adduce nothing but arbitrary presumption and specious speculation. But "the creditor must prove tangible and substantial facts from which a legitimate inference of fraudulent intent can be drawn." Wait, Fraud. Conv. § 5. Upon a critical survey of the case, I observe no proof of fraudulent intent on the part of the defendants, and, since the legal presumption of fraud was effectually effaced by the rescission of the illicit agreement, the mortgages must stand.

Judgment for defendants dismissing the complaint on the merits, with costs.